UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| KATHRYN MATRANGA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 07-cv-1350 |
| v. ) | |
| ) | |
| CATHOLIC CHARITIES OF THE ) | |
| DIOCESE OF PEORIA, ) | |
| *a not-for-profit corporation*, ) | |
| ) | |
| Defendant. ) | |

## O P I N I O N  &  O R D E R

The Defendant, Catholic Charities of the Diocese of Peoria ("Catholic Charities" or "the agency"), moved for summary judgment on February 2, 2009 (Doc. 32). On February 11, 2009, the Plaintiff, Kathryn Matranga, responded in opposition to the motion. Catholic Charities replied on February 25, 2009. For the reasons that follow, Catholic Charities' Motion for Summary Judgment is GRANTED.

### BACKGROUND

Kathryn Matranga has sued her former employer, Catholic Charities, alleging that she was terminated because of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et. seq. Catholic Charities is a not-for-profit organization that provides a variety of social services to individuals and communities in central Illinois. The agency employs over 400 people in ten offices within the state. (Def.'s SUMF ¶¶ 2-4).

In 1990, Catholic Charities hired Matranga to work as a secretary/receptionist at the agency's North Office located at 413 Northeast Monroe, Peoria, Illinois. At that time, the North Office housed four of the agency's social programs: Adoption, Natural Family Planning, Women's Counseling and Support Services ("WCSS"), and Senior Services. Early in her career at Catholic Charities, Matranga served all North Office programs except for Adoption. (Def.'s SUMF ¶¶ 15-16) The Adoption program had its own full-time secretary.[1] (Def.'s SUMF ¶ 17). During her first ten years with Catholic Charities, Matranga regularly performed the following work duties: typing routine correspondence; preparing and sending out standardized letters and other mail; preparing new case files and sending closed case files to archives; answering incoming calls and routing messages; greeting clients and routing them to staff members; overseeing the use of the agency's automobiles; ordering supplies; supervising the housekeeper; and typing caseworkers' note dictation.

In subsequent years, Matranga's work responsibilities at Catholic Charities diminished. By 2004, many of the caseworkers at the North Office were typing their own case notes on personal computers. (Def.'s SUMF ¶ 20; Exs. 1-2 to Def.'s

---

[1] There is some evidence that Matranga assisted with an "adoption search" program during the early part of her employment with Catholic Charities. (Exs. 1-2 to Def.'s Mot. for SJ, Matranga Dep., at pp. 10-14, 21-22, 27-28). According to Matranga's deposition testimony, the program involved helping adopted persons locate their birth parents. (Matranga Dep. at p. 11). It is not entirely clear whether the adoption search program was affiliated with Catholic Charities' official Adoption program. (Matranga Dep. at p. 28).

2

Mot. for SJ, Matranga Dep., at pp. 42-43).[2] Also, in or around 2004, another Catholic Charities employee, Linda Williams, took over the secretarial work for the WCSS program. (Def.'s SUMF ¶ 21; Matranga Dep. at pp. 42-43).[3] Linda Williams had worked for Catholic Charities since approximately 2003. (Matranga Dep. at p. 45; Ex. 4 to Def.'s Mot. for SJ, Rosemary Haynes Dep., at pp. 28-29). By July 2004, Matranga's primary job responsibilities were limited to greeting clients and answering incoming phone calls. (Matranga Dep. at pp. 61-63). She also spent some time typing note dictation for caseworkers in the Senior Services program, ordering office supplies, and assisting with maintenance/housekeeping issues. (Matranga Dep. at pp. 61-63). It is undisputed that Matranga satisfactorily performed the job duties assigned to her. (Def.'s SUMF ¶ 25).

Proficiency in computer software was a topic of concern that arose in the course of Matranga's employment with Catholic Charities. According to the deposition testimony of North Office supervisor Chris Kelly, the job description for Matranga's secretary/reception position called for familiarity with the software programs Microsoft Excel and Adobe PageMaker. (Ex. 3 to Def.'s Mot. for SJ, Chris Kelly Dep., at p. 50). Further, Kelly testified that Catholic Charities' management had suggested to Matranga that she needed to enhance her computer skills in order to move forward with the agency. (Kelly Dep. at p. 50).

---

[2] The Court will refer to Catholic Charities' exhibits by the numerical order in which they were electronically attached to the summary judgment motion, not by their internal labels.

[3] At some time around 2004, Linda Williams also apparently took over Matranga's adoption search duties. (Matranga Dep. at p. 43).

3

The parties dispute whether Matranga took adequate initiative to improve her proficiency in Excel and other software programs. It is undisputed that Matranga asked Catholic Charities' management at least a few times to provide her with software training. (Def.'s SUMF ¶¶ 26, 29). But, for various reasons, Matranga never received training. In one instance which occurred in or around 2004, Matranga asked Catholic Charities to sponsor her enrollment in a community college course focused specifically on Excel. (Def.'s SUMF ¶ 31). Because of funding concerns, Catholic Charities denied the request. (Def.'s SUMF ¶ 32). Around the same time, however, Catholic Charities apparently sponsored the enrollment of Matranga's coworker Linda Williams in an online Excel course offered through a different community college. (Matranga Dep. at pp. 52-53).[4] Matranga did not seek outside computer training after 2004, and no in-house training sessions were offered. (Def.'s SUMF ¶ 35).

In early 2006, Catholic Charities management determined that it would be necessary to relocate the North Office. At that time, the building which housed the North Office, at 413 Northeast Monroe, was owned by the Catholic Diocese of Peoria. (Def.'s SUMF ¶ 37). The Diocese allowed Catholic Charities to use the building in return for nominal rent. The annual occupancy costs for the facility at Northeast Monroe, including rent, utilities and other expenses, totaled less than $15,000. (Def.'s SUMF ¶ 39). At some point in the beginning portion of 2006,

---

[4] Although it is not precisely clear that Catholic Charities funded Linda Williams' enrollment in the Excel course, an inference in Matranga's favor permits that conclusion.

4

Catholic Charities learned that the Diocese intended to demolish the facility. In response, Catholic Charities management began to search for an alternative location to house the four programs administered through the North Office as of 2006: Senior Services, Adoption, WCSS, and Counseling ("satellite programs"). (Def.'s SUMF ¶ 40). Before Catholic Charities made a final decision as to an alternative location for the satellite programs, the Senior Services program elected to move to Catholic Charities' main campus on West Heading Avenue in Peoria. (Def.'s SUMF ¶ 46; Ex. 5 to Def.'s Mot. for SJ, 1/30/2009 A. Riordan Decl. ¶ 21). Accordingly, Catholic Charities management altered its real estate search to focus on a building that could accommodate the remaining three satellite programs.

In September 2006, Catholic Charities' management identified a suitable property located at 4806 North Sheridan Road in Peoria and negotiated a lease. (Def.'s SUMF ¶¶ 49-50). The annual occupancy costs for the North Sheridan facility totaled $49,000, an amount over three times the total occupancy cost of the old Northeast Monroe facility. (Def.'s SUMF ¶ 51). Despite the substantial increase in occupancy costs, however, Catholic Charities' management understood that the agency would receive no additional funding to cover the difference. (Def.'s SUMF ¶ 45). Accordingly, site supervisor Chris Kelly conducted a budget review to determine how best to reduce operating expenses. The budget analysis revealed that the North Office exceeded Catholic Charities' accepted staffing ratio of fourteen staff members to every one clerical position (14:1). (Def.'s SUMF ¶¶ 53-54). As of October 2006, the North Office had a staffing ratio of 9:2 -- the two clerical

5

employees being Matranga, who occupied the secretary/receptionist position, and Linda Williams, who occupied the adoption secretary/search intake worker position. (Def.'s SUMF ¶¶ 55-56). Kelly determined that it cost Catholic Charities $25,986 per year to employ Matranga and $25,382 per year to employ Williams. (Ex. 7 to Def.'s Mot. for SJ, 10/10/2006 Kelly Mem. to T. Riordan re Staff Reduction at p. 2).

Based on her budget review and her evaluation of program needs, Kelly decided that Matranga's position and Williams' position could be combined into a single position. On October 10, 2006, Kelly transmitted a memorandum to Catholic Charities' Associate Director, Tony Riordan, recommending that the agency retain Williams to occupy the combined position (adoption secretary/search intake worker/counseling secretary).[5] The memo also recommended that Catholic Charities terminate Matranga's employment. (10/10/2006 Kelly Mem. to Riordan re Staff Reduction at p. 3). In making her official written recommendation to keep Williams and terminate Matranga, Kelly expressly adhered to Catholic Charities' staff reduction policy as set forth in the agency's employee handbook. (10/10/2006 Kelly Mem. to Riordan re Staff Reduction at p. 2; Ex. 6 to Def.'s Mot. for SJ, Excerpts from Catholic Charities Employee Handbook at pp. 54-55). Under the agency's staff reduction policy, management took into account the following

---

[5] Kelly had prepared the memo in accordance with the Catholic Charities Human Resources Department's "Procedures for Staff Reduction Plans," an agency protocol setting out certain steps to be taken in conjunction with any reduction in staff. The protocol required the drafting and approval of a written plan for staff reduction. (Ex. 14 to Def.'s Mot. for SJ, 7/2002 Human Resources Procedures for Staff Reduction Plans ¶¶ 1-4). It is undisputed that Catholic Charities adhered to the protocol in terminating Matranga's employment. (Def.'s SUMF ¶¶ 65-80).

6

considerations when selecting the employees who would be affected by a cut in workforce: (1) program needs; (2) job classification; (3) budgetary concerns; (4) performance; and (5) qualifications and length of service.  Touching upon these considerations in her October 10, 2006 memo to Tony Riordan, Kelly stated as follows:

> Currently Linda Williams and Kay Matranga have different and distinct job descriptions.  Kay's primary responsibilities are answering the phones and greeting clients.  Kay has no experience with the adoption, search intake, and counseling responsibilities that this position will require.  Linda has experience doing Kay's job.  Program needs, qualifications, and seniority were all considered in determining this staff reduction.  We are requesting to eliminate the full-time secretary position prior to the relocation of the counseling and adoption programs.

(10/10/2006 Kelly Mem. to Riordan re Staff Reduction at p. 3).[6]  At her deposition, Kelly testified that she essentially gave equal weight to all staff reduction policy considerations -- including seniority -- in arriving at the decision to terminate Matranga.  (Kelly Dep. at pp. 44-48).  Kelly also testified that Matranga's lack of proficiency in Excel and PageMaker factored into the decision, as did Matranga's perceived lack of initiative to become proficient in these software programs.  (Kelly Dep. at pp. 49-51).

On October 19, 2006, Riordan accepted and approved Kelly's recommended plan for staff reduction, i.e. Matranga's termination.  The same day, Catholic Charities' Human Resources Director, Rosemary Haynes, and the agency's

---

[6] In deposition testimony, Kelly restated her belief that Matranga had no experience in performing the duties Williams performed.  Kelly also reiterated that Matranga's job duties were basically limited to handling phone calls and greeting clients.  (Kelly Dep. at pp. 51-53).

7

Executive Director, Peggy Arizzi, also approved the plan. (10/10/2006 Kelly Mem. to Riordan re Staff Reduction at p. 3; Haynes Dep. at pp. 14-15). In deposition testimony, Haynes, like Kelly, indicated that Williams had a much higher level of aptitude than Matranga in Excel and in computer-related matters generally. (Haynes Dep. at p. 37). Haynes further testified that Williams' superior qualifications for the new position outweighed Matranga's seniority. (Haynes Dep. at pp. 34-36). At the time management approved the staff reduction plan, Matranga was 62 years old and Williams was 47. (Matranga Dep. at pp. 98-99; Def.'s SUMF ¶ 56).

On the afternoon of October 19, 2006, Rosemary Haynes and Chris Kelly met with Matranga to let her know that her position was being terminated ("termination meeting"). Haynes explained to Matranga that Catholic Charities had decided to combine the secretary/receptionist position and the adoption secretary/search intake worker position. Haynes told Matranga that Catholic Charities had selected Linda Williams to fill the combined position and that Matranga's employment would be terminated on November 10, 2006. (Def.'s SUMF ¶¶ 81-85). There seems to be an issue of fact as to whether Matranga mentioned retirement at the meeting. Both Kelly and Haynes testified at their depositions that after Matranga was notified of her termination, she commented about her family's wish for her to retire. (Haynes Dep. at p. 44; Kelly Dep. at p. 37). At her deposition, Matranga did not flatly deny mentioning retirement but stated that she could not recall exactly what she said at the meeting. (Matranga Dep. at p. 93).

8

Matranga further testified that during 2006, her family had not expressed any desire for her to stop working. (Matranga Dep. at p. 93).

The issue of health insurance coverage came up at the termination meeting. Matranga testified that Haynes told her during the meeting that if she elected to classify her separation from Catholic Charities as a retirement, she would be covered by Catholic Charities' health insurance plan past the standard nine-months of post-termination coverage. (Matranga Dep. at pp. 94-95). Matranga also testified that soon after the meeting, she put in a call to the Diocese's insurance office and spoke with a person named Pat Hanley about health insurance coverage. Hanley advised Matranga that because she had been employed with Catholic Charities for fifteen years, she could continue her health insurance if she paid COBRA premiums.[7] Matranga testified that Hanley said nothing about retirement being a precondition to extended health care coverage. (Matranga Dep. at pp. 94-96).

At her deposition, Haynes was not asked specifically whether she advised Matranga to retire in order to extend Matranga's health care coverage. According to Haynes, Matranga independently (without any prodding) decided to designate her separation from Catholic Charities as a retirement. (Haynes Dep. at pp. 51, 53). In deposition testimony, Haynes also seemed to confirm that, in October 2006,

---

[7] Under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), codified in relevant part at 29 U.S.C. §§ 1161-68, employees who lose health benefits due to job loss can continue to receive coverage under certain circumstances. See Mlsna v. Unitel Commc'ns, Inc., 41 F.3d 1124, 1126-28 (7th Cir. 1994); see also Department of Labor Website, Continuation of Health Coverage – COBRA, http://www.dol.gov/dol/topic/health-plans/cobra.htm.

9

Matranga fit the definition of a retiree under the Diocese's health plan and was therefore eligible for longer continuation coverage. Specifically, Haynes testified, "Under our diocesan plan, the definition of a retiree is someone who is 62 years of age, is retired from the diocese or Catholic Charities and has had 15 years of service. So she could qualify for that." (Haynes Dep. at p. 51). Ultimately, Matranga did, in fact, receive health insurance coverage under Catholic Charities' plan after her termination and up until December 2008 when she became eligible for Medicare. (Matranga Dep. at pp. 98-99).

On the morning of October 20, 2006, according to Matranga's deposition testimony, Matranga visited with Chris Kelly and told her that she did not want others at the office to know she was being terminated. In response, according to Matranga, Kelly stated, "We already told them that you're retiring." (Matranga Dep. at p. 92). Subsequently, Catholic Charities threw a retirement party for Matranga. (Matranga Dep. at pp. 106-07).

On November 2, 2006, days before Matranga's termination became effective, Rosemary Haynes sent Matranga a letter on behalf of Catholic Charities. The letter stated, in part, as follows:

> Dear Kay: Congratulations on your retirement effective November 10, 2006! Kay, we truly appreciate your dedication and service to our clients and staff throughout the years. You have been such an integral part of this agency for over sixteen years. You will be missed by all. As we discussed prior to your decision to retire, your position of North Office Secretary was being eliminated due to the need for less clerical support for our Counseling, WCSS and Adoption programs. We are happy that you will be able to enjoy retirement.

(Ex. 15 to Def.'s Mot. for SJ, 11/2/2006 Haynes Letter to Matranga re Retirement).

10

On December 20, 2007, Matranga, through her attorney, initiated this action in federal court, alleging that Catholic Charities violated the ADEA by discharging her because of her age.[8] (Doc. 1). Matranga filed an Amended Complaint on November 12, 2008, raising the same claim. (Doc. 12). Catholic Charities has moved for summary judgment.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. SMS Demag Aktiengesellschaft v. Material Sciences Corp., 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. Smith v. Hope School, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. Id.

It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the court relies on the non-moving party to identify the evidence which creates an issue of triable fact. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). If the evidence on record

---

[8] Prior to filing her Complaint in federal court, Matranga filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Matranga a right-to-sue notice on or about December 3, 2007.

11

could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## ANALYSIS

The ADEA protects persons over the age of forty from age discrimination in employment. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 615 (7th Cir. 2000). The statute makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish her disparate treatment claim under the ADEA, Matranga must show that Catholic Charities terminated her employment because of her age. More specifically, she must show that her age was a determining factor in Catholic Charities' decision to discharge her. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

Matranga may advance her ADEA claim by utilizing either the direct or indirect method of proof. "The direct method of proof involves direct evidence, such as near-admissions by the employer, as well as more attenuated circumstantial evidence that suggests discrimination albeit through a longer chain of inferences." Faas v. Sears, Roebuck & Co., 532 F.3d 633, 641 (7th Cir. 2008) (internal quotations

omitted). The indirect method, developed by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), involves a three-step burden-shifting analysis. At the first step, the aggrieved employee must make out a prima facie case by presenting "a certain subset of circumstantial evidence that [generally] includes how the employer treat[ed] similarly situated employees." Faas, 532 F.3d at 641. If the employee is able to make out a prima facie case, then the burden shifts to the employer, at step two, to articulate a legitimate, non-discriminatory reason for its decision. Id. at 641-42. Once the employer meets the step-two threshold, the burden shifts back to the employee, at the third and final step, to demonstrate that the employer's proffered reason is merely pretext for discrimination. Id. at 642. Matranga seeks to survive Catholic Charities' summary judgment motion by making her case under both the direct and indirect methods.

    I.    Direct Method

Matranga does not offer any direct, "smoking-gun" evidence of age-based discrimination; she does not point to any near-admission of discriminatory motivation by Catholic Charities' management in connection with her termination. Instead, she attempts to construct a "convincing mosaic of circumstantial evidence" that would pave the way for an inference of intentional discrimination. See Cerutti v. BASF Corp., 349 F.3d 1055, 1061 (7th Cir. 2003). The Seventh Circuit has recognized three types of circumstantial evidence that a plaintiff employee may use under the direct method:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2)

13

> evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

Atanus v. Perry, 520 F.3d 662, 672 (7th Cir. 2008) (quotations omitted). The circumstantial evidence that Matranga has presented is insufficient to permit an inference of intentional age-based discrimination by Catholic Charities.

### A. References to Retirement

Matranga first points to Rosemary Haynes' references to "retirement" at and after the October 19, 2006 termination meeting. Indeed, there are several instances where Catholic Charities' management characterized Matranga's termination as a retirement. Haynes' November 2, 2006 letter to Matranga repeatedly acknowledged Matranga's "decision to retire." In addition, Matranga's deposition testimony suggests that Haynes may have advised Matranga to deem her separation from Catholic Charities as a retirement rather than a termination. (Matranga Dep. at pp. 94-95). There is also evidence that after the termination meeting, Chris Kelly told Catholic Charities' North Office staff that Matranga had decided to retire. (Matranga Dep. at p. 92). Further, Matranga testified that Catholic Charities threw her a retirement party. (Matranga Dep. at pp. 106-07).

Although Catholic Charities' references to Matranga's "retirement" are aplenty, they are not material to the issue at hand: whether Matranga's age was a determining factor or influence in Catholic Charities' decision to discharge her. See Michas, 209 F.3d at 692. Matranga presents no evidence connecting Haynes' and

14

Kelly's statements about retirement with the internal decision by Catholic Charities' management to terminate Matranga's employment. The evidence does not show that Haynes, Kelly, or any member of management referred to the prospect of Matranga's retirement in arriving at their decision to eliminate her secretarial position. Therefore, there is a crucial missing link in the chain of inferences that Matranga attempts to construct. Construed in Matranga's favor, the evidence suggests that Haynes and Kelly began to spin Matranga's discharge as a retirement only after the agency's management team had decided to terminate her. Haynes tried to persuade Matranga into retiring so that Matranga could receive continuation in coverage under Catholic Charities' health insurance plan. Kelly mentioned Matranga's retirement to staff after the October 19, 2006 termination meeting only to save Matranga some embarrassment or stigma associated with being let go. There is insufficient evidence from which a jury could find otherwise.

### B. Qualifications & Seniority

Matranga asserts that Catholic Charities violated its own rules relating to staff reductions by retaining Linda Williams to occupy the combined position (adoption secretary/search intake worker/counseling secretary) despite Matranga's seniority and equivalent qualifications for the position. Imbedded in Matranga's assertion is the argument that she did not receive fair consideration for the combined position because of her age. That argument is contradicted by

uncontroverted evidence and, therefore, cannot support an inference of age discrimination.

In proposing Matranga's discharge to upper management, Chris Kelly followed Catholic Charities' staff reduction policy as provided in the agency's employee handbook.  (10/10/2006 Kelly Mem. to Riordan re Staff Reduction at p. 2; Excerpts from Catholic Charities Employee Handbook at pp. 54-55).  In adhering to the policy's guidelines, Kelly took into consideration Matranga's seniority and qualifications as compared to Williams'.  (10/10/2006 Kelly Mem. to Riordan re Staff Reduction at p. 2; Kelly Dep. at pp. 44-51).  Ultimately, Kelly and the rest of Catholic Charities management decided that Williams' superior qualifications outweighed Matranga's seniority.  Catholic Charities desired to fill the combined position with a candidate who was experienced in working with the Adoption program and proficient in key software programs including Excel and PageMaker. The October 10, 2006 staff reduction memo and related deposition testimony by Kelly and Haynes show that Williams possessed both qualifications while Matranga possessed neither.[9]  (Kelly Dep. at pp. 48-53; Haynes Dep. at pp. 34-38).  The evidence also shows that Williams had experience performing Matranga's job duties, which had become limited over the years and, as of 2006, primarily consisted

---

[9] Matranga insists that she was capable of performing Adoption program duties. Her purported capability to perform Adoption-related duties is a separate issue from whether she was experienced in performing those duties as of October 2006. Although Matranga testified to performing some "adoption search" tasks early in her career at Catholic Charities, she has conceded for purposes of summary judgment that she never performed work for the Adoption program.  (Def.'s SUMF ¶ 23; Pl.'s Resp. at p. 5 ¶ 23).

16

of answering phones and greeting clients.[10]  (10/10/2006 Kelly Mem. to Riordan re Staff Reduction at p. 3; Haynes Dep. at p. 37; Matranga Dep. at pp. 61-63, 83-86).

Matranga offers nothing to undercut Catholic Charities' reasons for selecting Williams over her, other than testimony of her own belief that sixteen years' experience working for Catholic Charities made her the more qualified candidate. Matranga's vague, self-interested assessment of her own qualifications is not enough to create an issue of fact as to the legitimacy of Catholic Charities' business decision.  See Nichols v. Southern Ill. Univ.-Edwardsville, 510 F.3d 772, 784 (7th Cir. 2007) (citing Gustovich v. AT & T Commc'ns, Inc., 972 F.2d 845, 848 (7th Cir. 1992)).  And Matranga is incorrect to the extent she asserts an ADEA-based entitlement to the combined position based on seniority alone.  See Tice v. Lampert Yards, Inc., 761 F.2d 1210, 1217 (7th Cir. 1985) ("The ADEA was not intended to legislate seniority rights where none exist in the contract of employment.").[11]

      C.  Computer Software Training

Matranga contends that Catholic Charities' refusal to offer her training in Excel, PageMaker, and other software programs constitutes circumstantial evidence of age discrimination.  The evidence, construed in Matranga's favor, does indicate that Catholic Charities refused at least a few of Matranga's requests for training in computer software.  Specifically, Matranga points to a 2004 incident in which the

---

[10] Matranga makes no developed argument that Catholic Charities narrowed her work responsibilities from 1990 to 2006 because of her age.  At any rate, there is insufficient evidence to support a finding to that effect.

[11] Matranga does not dispute that her employment with Catholic Charities was at-will.

agency refused to fund her enrollment in an Excel course at a local community college.[12] (Matranga Dep. at pp. 52-53). Nevertheless, there is no evidence to suggest that Matranga's age played any role in Catholic Charities' decisions not to sponsor her enrollment in software training. Without a more developed evidentiary showing (and a more tailored argument) by Matranga, it is unreasonable to construe the agency's refusal to train her in computer software as evidence that she was discharged based on her age.

Matranga has not produced sufficient circumstantial evidence to survive summary judgment under the direct method.

II. Indirect Method

Under the indirect method of proving age discrimination, in a general reduction-in-force ("RIF") scenario, a plaintiff employee must make out a prima facie case by presenting evidence that: (1) she was a member of the protected class; (2) she was performing her job to her employer's expectations; (3) she was subject to an adverse employment action; and (4) other similarly situated employees who were substantially younger or outside the protected class were treated more favorably. Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc., 517 F.3d 470, 475 (7th Cir. 2008); Michas, 209 F.3d at 693. In a "mini-RIF" scenario where, as here, the discharged employee's duties were taken on by another employee rather than

---

[12] There is also evidence that Catholic Charities paid for Linda Williams' enrollment in an online Excel course at about the same time the agency refused to pay for Matranga's enrollment. (Matranga Dep. at pp. 52-53). However, Matranga has not developed any argument based on the difference in treatment; and in any event, there is no evidence that age was a factor.

18

eliminated, the fourth prong of the prima facie case is modified. Filar v. Bd. of Educ. of City of Chicago, 526 F.3d 1054, 1060 (7th Cir. 2008). The modification replaces the "similarly situated" requirement with a requirement that the discharged employee's duties were absorbed by other substantially younger employees who were retained. Id.

In the present case, Catholic Charities essentially concedes that Matranga can satisfy a mini-RIF prima facie case.[13] Accordingly, the burden shifts to Catholic Charities to articulate a legitimate, non-discriminatory reason for discharging her. Faas, 532 F.3d at 642. Catholic Charities has satisfied its burden by demonstrating that Matranga's position was combined with another position for budgetary reasons and that Matranga was not retained to fill the combined position because another employee was better qualified. Catholic Charities learned in early 2006 that it would have to move out of the North Office building at Northeast Monroe. Management soon found a new North Sheridan location for the agency's satellite programs, but the occupancy costs for the new building were more than triple what the agency paid to occupy the old building. (Def.'s SUMF ¶¶ 39, 51). As a result, Catholic Charities decided to cut costs by eliminating staff. Chris Kelly decided that the agency could save money by eliminating Matranga's position and transferring her job duties to Linda Williams. (Def.'s SUMF ¶¶ 52-60). Kelly and the rest of Catholic Charities' management chose to retain Williams over Matranga

---

[13] Because Matranga was at least ten years older than Williams, there is a presumption that Williams was "substantially younger" than Matranga, for purposes of a prima facie showing. Bennington v. Caterpillar, Inc., 275 F.3d 654, 659 (7th Cir. 2001).

19

for three reasons: Williams was more skilled in relevant software programs; Williams had substantial experience in performing job duties for the Adoption program whereas Matranga did not; and Williams had experience performing Matranga's primary job duties. (10/2006 Kelly Mem. to Riordan re Staff Reduction at p. 3; Kelly Dep. at pp. 48-53; Def.'s SUMF ¶ 56).

Because Catholic Charities has met its burden of articulating a legitimate, non-discriminatory reason for Matranga's discharge, the burden shifts back to Matranga to provide evidence that Catholic Charities' stated reason is pretext for discrimination. Faas, 532 F.3d at 642. "Pretext means a dishonest explanation, a lie rather than an oddity or an error . . . . Showing pretext requires proof that the defendant's explanation is unworthy of credence." Id. (internal quotations and citations omitted). Matranga offers nothing to substantiate her assertion that Catholic Charities' stated reason for terminating her was a lie. Accordingly, her case fails under the indirect method. No reasonable jury could find otherwise.

## CONCLUSION

For the reasons stated above, Defendant Catholic Charities' Motion for Summary Judgment (Doc. 32) is GRANTED.

CASE TERMINATED.

ENTERED this 2nd day of September, 2009.

s/ Joe B. McDade  
JOE BILLY McDADE  
United States District Judge